# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

––––––––––––––––––

Nº 05-CV-4625 (JFB)

––––––––––––––––––

PHILLIP SINGER,

Plaintiff,

VERSUS

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

Defendant.

––––––––––––––––––

Memorandum and Order
March 27, 2007

––––––––––––––––––

JOSEPH F. BIANCO, District Judge:

Plaintiff Phillip Singer ("Singer") brings this action pursuant to 42 U.S.C. § 405(g), challenging the final decision of defendant Michael J. Astrue,[1] Commissioner of the Social Security Administration (the "Commissioner" and the "SSA," respectively), that Singer was not entitled Social Security Disability Insurance Benefits ("SDI") and was not eligible for Supplemental Security Income benefits ("SSI") prior to March 28, 2002 under Title II of the Social Security Act (the "Act"). The Commissioner moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the reasons that follow, defendant's motion is granted.

## I. BACKGROUND

### A. Prior Proceedings

Plaintiff filed applications for SDI and SSI benefits on July 25, 1997. (Tr. 129-33.)[2] The applications were denied. (Tr. 83, 90-93.) On reconsideration, plaintiff requested a hearing (Tr. 96-102), which was held on February 29, 2000 before Administrative Law Judge ("ALJ") Katherine C. Edgell (Tr. 103, 569-91). On April 25, 2000, ALJ Edgell found that plaintiff was not disabled. (Tr. 295-306.) Plaintiff requested a review of the hearing decision by the Appeals Council. (Tr. 307-

––––––––––––––––––

[1] Michael J. Astrue is substituted for Jo Anne B. Barnhart as the Commissioner of Social Security named in the caption pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

[2] References to "Tr." are to the transcript of the administrative record in this case.

12.) By Order dated March 8, 2002, the Appeals Council granted plaintiff's request for review and remanded the case to the ALJ for further administrative proceedings. (Tr. 313-16.) A supplemental hearing was held on January 13, 2004 before ALJ Eileen P. Burlison. (Tr. 46-82.) On May 7, 2004, ALJ Burlison issued a decision finding that plaintiff was not disabled. (Tr. 20-30.) On April 20, 2005, the Appeals Council issued a final decision finding that plaintiff was not disabled, as defined by the Act, prior to March 28, 2002, but was disabled as of that date. (Tr. 11-18.)

## B. Non-Medical Evidence

Plaintiff was born on March 29, 1947. (Tr. 574.) He attended school through the fifth grade. (Tr. 161, 175.) Plaintiff last worked in 1989 at a warehouse owned by his brother. (Tr. 50, 53, 577.)

At the January 13, 2004 hearing before the ALJ, plaintiff complained of pain in his left hip and back. (Tr. 51.) He also complained of a seizure disorder. (Tr. 57.) Plaintiff claimed that his most recent seizure had occurred in February 2003, and that, prior to that seizure, his most recent seizure had occurred several months earlier. (Tr. 59.) Plaintiff also complained of depression, but said that he did not take medication for any mental problems. (Tr. 68.) Plaintiff said that he discontinued psychiatric treatment in 1998 because he believed that he did not need it. (Tr. 69.)

Plaintiff further testified that he drove a car occasionally, and that he had driven to the Catskill Mountains the previous summer. (Tr. 62.) He said that he rode the bus occasionally as well. (Tr. 63-64.) Plaintiff said that he went shopping for groceries and had them delivered to his home. (Tr. 61.) Plaintiff also said that he watched television, read the newspaper and went to synagogue. (Tr. 64.)

## C. The Vocational Expert's Testimony

At the January 13, 2004 hearing, a vocational expert, Mark M. Ramnauth ("Ramnauth"), testified that plaintiff's former work as a warehouse worker was unskilled heavy work. (Tr. 74.) The ALJ asked Ramnauth to testify regarding the work capabilities of a person of plaintiff's age, education and work history, who was able to perform simple, unskilled light work, but needed to avoid heights, dangerous machinery, prolonged standing and prolonged walking. (Tr. 75.) Ramnauth stated that such a person could not perform plaintiff's past relevant work. (*Id.*) However, according to Ramnauth, such a person could perform the sedentary jobs of assembler, assembler at the light exertional level, and document preparer. (Tr. 75-76.) Ramnauth testified that the number of these jobs were approximately 800,000 nationally and 8,000 locally. (*Id.*) Ramnauth also said that such a person could perform the job of ticket taker, of which there were approximately 60,000 jobs nationally and 5,000 locally. (Tr. 78.)

## D. Medical Evidence

### 1. Plaintiff's Hip Surgery

On January 11, 1993, plaintiff was admitted to Maimonides Medical Center, complaining of pain in his left hip. (Tr. 203-04, 238-39.) The clinical examination revealed external rotation deformity of the leg and tenderness over the anterior capsule. (Tr. 205.) X-rays revealed a Garden Type III fracture. (*Id.*) On January 12, 1993, plaintiff underwent surgery on his left hip. (Tr. 203-04.) Plaintiff did well post-operatively and

was discharged on non weight-bearing status on January 20, 1993. (Tr. 205.)

2. Medical Examinations Prior to 1998

a. Dr. Joseph Feliccia

Following his surgery, plaintiff saw his surgeon, Dr. Joseph Feliccia, approximately twelve times. (Tr. 194-202.) Dr. Feliccia examined plaintiff on February 15, 1993, and found that plaintiff had minimal complaints of pain, was ambulating with a walker, was able to perform a straight-leg raise, his surgical wound was healing well, and x-rays indicated that his fracture was "in excellent position." (Tr. 194.)

Dr. Feliccia examined plaintiff again on March 24, 2003. (Id.) Dr. Feliccia noted that plaintiff was asymptomatic, there appeared to be healing about the superior margin of the neck, and there were no avascular findings. (Id.)

Dr. Feliccia's examination on October 28, 1993, at which time plaintiff was walking with a walker, revealed no specific tenderness and good functional mobilization. (Tr. 195.) Moreover, plaintiff was experiencing little pain on passive manipulation of the hip and x-rays revealed that the fracture appeared to be healing. (Id.)

At Dr. Feliccia's examination of plaintiff on November 24, 1993, plaintiff was ambulating with a walker and had fewer complaints regarding pain. (Tr. 196.) The examination revealed no tenderness about the hip, and x-rays indicated that plaintiff had a healing fracture in good axial alignment. (Id.)

At Dr. Feliccia's examination of plaintiff on December 22, 1993, plaintiff had no significant complaints of pain and his clinical examination was unchanged from his previous visit. (Id.) Moreover, x-rays revealed that plaintiff's fracture was uniting. (Tr. 197.) Dr. Feliccia advised plaintiff to begin graduated weight-bearing to tolerance using a cane and to refrain from lifting, pushing, pulling and impact activity. (Id.)

At an examination on May 18, 1994, plaintiff complained to Dr. Feliccia of pain in his left groin with weight-bearing. (Id.) A clinical examination revealed anterior capsular tenderness and mild restriction of internal rotation. (Id.) X-rays revealed a healed fracture with evidence of avascular necrosis involving the superior and lateral aspect of the femoral head. (Id.) Moreover, there was a cystic lesion over the anterior lateral aspect of the head with early collapse consistent with avascular necrosis. (Id.)

On September 9, 1994, another examination by Dr. Feliccia revealed that plaintiff had improved functional range of motion in the hip, and that plaintiff was experiencing less pain. (Tr. 198.) X-rays revealed no further evidence of avascular necrosis. (Id.)

At an examination of plaintiff on February 15, 1995, Dr. Feliccia found that plaintiff had improved functional mobilization, and that x-rays indicated that his hip fracture was "healing beautifully." (Tr. 199.)

On October 18, 1995, plaintiff ambulated independently during his visit with Dr. Feliccia. (Id.) An examination revealed some tenderness over the lateral aspect of the troch on palpation of the hilar. (Id.) However, Dr. Feliccia also noted that plaintiff had a quite functional range of motion, and that x-rays revealed that plaintiff's fracture was healed. (Id.) Additionally, Dr. Feliccia reported that

the avascular necrosis had healed with no collapse. (*Id.*)

On November 6, 1996, plaintiff visited Dr. Feliccia and complained of pain in his groin and thigh on ambulation, and said the he needed to use a cane. (Tr. 200.) During that visit, plaintiff was able to stand erect, had mild antalgic gait, and was able to perform the straight-leg raise. (*Id.*) An examination revealed there was good muscle mass, and x-rays indicated that the fracture was healed with no further progression of avascular necrosis. (*Id.*)

On March 11, 1997, Dr. Felicia provided plaintiff with a letter regarding plaintiff's medical condition. (Tr. 201.) The letter stated that it was very difficult for plaintiff to stand or sit for long periods of time because of his condition. (*Id.*) It also stated that plaintiff was unable to use public transportation because he could not climb stairs. (*Id.*)

### b. Dr. Rocco Bevilaqua

On November 17, 1995, a radiologist, Dr. Rocco Bevilaqua, evaluated x-rays of plaintiff's left hip. (Tr. 181.) The x-rays showed the presence of fixation devices, screws and plates, which are indicative of a previous healed fracture. (*Id.*) According to Dr. Bevilaqua, plaintiff's femur showed excellent anatomical restoration of the head, neck and upper-third, which indicated complete healing. (*Id.*)

### c. Dr. Ananya Banerjee

On November 25, 1995, Dr. Ananya Banerjee performed a consultative orthopedic evaluation of plaintiff and made the following findings: Plaintiff walked slowly with a cane favoring his left lower extremity, had a stable but antalgic gait, and had some difficulty on toe and heel walking but did not appear to need a cane for ambulation. (Tr. 182.) Plaintiff had no difficulty getting onto the examining table and lying down and had full range of motion of the neck, shoulders, elbows, wrists, hands, ankles, feet, and right hip. (*Id.*) His hands had normal grip and normal fine manipulation, and his knee and ankle jerks were normal on both sides. (*Id.*) His left hip had some tenderness on palpation. (*Id.*) His forward flexion was 75 degrees, rotation was 25 degrees, exterior rotation was 30 degrees, backward extension was 20 degrees, abduction was 25 degrees an adduction was 10 degrees. (Tr. 182-83.) Plaintiff had no signs of muscle asymmetry, wasting or atrophy. (Tr. 183.) His superficial touch and temperature were normal and pulses were present. (*Id.*) His muscle power was 5+/5+ and his thigh and mid-calf measurements were equal on both sides. (*Id.*) The lumbar spine showed normal lordosis and full range of motion, and the straight-leg raising test was negative. (*Id.*) Plaintiff had no sensory, motor or reflex abnormalities. (*Id.*)

Dr. Banerjee noted diagnoses of status post fracture of the left hip, status post surgery of the left hip, arthralgia of the left hip and history of seizure disorder. (*Id.*) Dr. Banerjee recognized moderate limitations for plaintiff with respect to heavy lifting, carrying, pushing, pulling, and standing or walking for prolonged periods. (*Id.*) In a physician's assessment dated November 24, 1995, Dr. Banerjee stated that plaintiff could perform the exertional requirements of medium work. (Tr. 192.)

### d. Dr. B. Fajardo

On November 22, 1995, Dr. B. Fajardo performed a consultative physical examination of plaintiff and made the

4

following findings: Plaintiff was alert and oriented and his behavior was appropriate. (Tr. 184.) His blood pressure was 140/80 mm/Hg. (Tr. 185.) Plaintiff's eyes showed normal extraocular movements and normal fuduscopic examination. (*Id.*) His neck was normal and his chest was symmetrical without deformity. (*Id.*) Plaintiff's lungs were clear. (*Id.*) His heart had regular S1 and S2 sounds, with no murmurs, gallops, rubs or clicks. (*Id.*) His abdomen was normal. (*Id.*) His extremities showed no clubbing, cyanosis or edema. (*Id.*) Peripheral pulsation was intact. (*Id.*) Plaintiff walked with a cane. (*Id.*) He had some difficulty getting up from a sitting position and getting on and off the examination table. (*Id.*) He had full use of both hands and arms in dressing and undressing. (*Id.*) Grasping strength and manipulative functions were not impaired. (*Id.*) There was no tenderness or spasm of the back or other musculature. (*Id.*) range of motion of the lumbosacral spine was full. (*Id.*) All peripheral joints had full range of motion without deformities, swelling, warmth or tenderness. (*Id.*) Plaintiff had no joint redness or instability. (*Id.*) Straight-leg raising was positive secondary to pain over the left hip. (*Id.*) Lymph nodes were not palpable and not enlarged. (*Id.*) The neurological examination revealed that plaintiff was alert and oriented. (*Id.*) The cranial nerves were intact. (*Id.*) Motor, tone and strength were 5/5 bilaterally. (*Id.*) There was no sensory deficit. (*Id.*) The deep tendon reflexes were 2+ bilaterally. (*Id.*) An electrocardiogram revealed regular sinus rhythm, intraventricular conducting defect and left ventricular hypertrophy. (*Id.*)

Dr. Fajardo made diagnoses of left hip pain, status post left hip fracture, status post left hip surgery, and seizure disorder controlled with medication. (*Id.*) Dr. Fajardo also indicated that plaintiff's ability to do work-related activities was limited. (*Id.*)

e. Dr. Mario Mancheno

On September 11, 1997, Dr. Mario Mancheno performed a consultative examination of plaintiff and made the following findings: Plaintiff was cooperative and oriented. (Tr. 214.) His level of communication was good. (*Id.*) He had no difficulty getting up from the chair, dressing, undressing, getting on and off the examining table, or lying down. (*Id.*) Plaintiff had good coordination and rhythm. (*Id.*) His gait was steady. (*Id.*) His posture was good. (*Id.*) He had a limp favoring the left lower extremity. (*Id.*) He did not need a cane for sustained ambulation. (*Id.*) He had difficulty on heel-toe walking. (*Id.*) Plaintiff's head, eyes, ears, nose and throat were normal. (*Id.*) His neck showed no loss of lordosis, and was supple with no masses, bruits, rigidity, or spasticity of the muscles. (*Id.*) Plaintiff's upper extremities had full range of motion with normal grip and fine manipulations. (Tr. 215.) The lower extremities had full range of motion of the right hip and both knees, ankles, and feet. (*Id.*) Plaintiff's left hip showed a surgical scar, no tenderness and no rigidity. (*Id.*) Flexion was to 90 degrees, abduction was to 25 degrees, adduction was to 10 degrees, external rotation was to 25 degrees and internal rotation was to 15 degrees. (*Id.*) His muscle power was 5+/5+ in the upper extremities and the right lower extremity, but 3+/5+ in the left lower extremity due to atrophy of the quadriceps muscle of the left thigh. (*Id.*) The lumbosacral spine exhibited full range of motion. (*Id.*) Plaintiff had no scoliosis, tenderness, spasticity, rigidity or loss of lordosis. (*Id.*) The straight-leg raising test was normal at 90 degrees on both sides. (*Id.*) The deep tendon reflexes were 1+ in both biceps, 3+ in both knees and 2+ in both

ankles. (*Id.*) Plaintiff's sensation was normal. (*Id.*) He had no tremor. (*Id.*) The Babinski was negative and x-rays of plaintiff's left hip showed minimal osteoarthritic changes. (Tr. 216.) Dr. Mancheno stated that plaintiff had moderate restrictions with respect to lifting, carrying, standing, walking, pushing, pulling and sitting. (*Id.*)

### f. Dr. Jarmila Bueche.

On September 24, 1997, Dr. Jarmila Bueche, a state agency medical consultant, completed a physical residual functional capacity assessment of plaintiff. (Tr. 218-25.) Dr. Bueche stated that plaintiff could lift and carry up to 50 pounds occasionally and 25 pounds frequently, sit for six hours, stand and/or walk for two hours in an eight-hour day, and could occasionally climb, balance, stoop, kneel, crouch and crawl. (Tr. 219-20.) Dr. Bueche noted no other limitations. (Tr. 221-25.)

### 3. Plaintiff's Hospitalization in 1998

Plaintiff was hospitalized for psychiatric treatment from February 12, 1998 to February 17, 1998 at the Maimonides Medical Center. (Tr. 244-45, 264-81, 342-479.) At the time of his admission, plaintiff was depressed but cognitively intact. (Tr. 266, 478.) He verbalized suicidal ideations, and showed poor insight, judgment, and impulse control. (*Id.*)

Plaintiff's condition improved significantly with therapy. (Tr. 267, 479.) He fully participated in therapy sessions and strongly denied suicidal or homicidal ideations, intentions and plans. (*Id.*) Plaintiff was discharged to his brother's home after a successful exit meeting. (*Id.*)

Upon his discharge, plaintiff was friendly and showed no signs of perceptual, affective, delusional, or vegetative disturbances. (*Id.*) He was oriented in three spheres. (*Id.*) There were no abnormal motor movements. (*Id.*) His insight, judgment, and impulse control were improved and appropriate. (*Id.*) The discharge diagnosis was adjustment disorder with mixed disturbance of emotions and conduct. (Tr. 266, 478.) Plaintiff was given a two-week supply of Dilantin for his seizure disorder and instructed to see a therapist in the outpatient clinic. (Tr. 244.)

Plaintiff was discharged from outpatient services on May 11, 1999. (Tr. 341.) At the time of his discharge, plaintiff was stable, and there was no overt psychosis or suicidal or homicidal ideation. (*Id.*) Moreover, at that time, it was noted that plaintiff had not visited the clinic for over ninety days.

### 4. Medical Examinations in or after 1998

### a. Dr. Perry Stein

On February 10, 1998, Dr. Perry Stein performed a consultative physical examination of plaintiff and made the following findings: Plaintiff's muscle tone and bulk were within normal limits. (Tr. 247.) There was a well-healed surgical scar on the left lateral thigh. (*Id.*) Muscle strength for the left hip flexion was 4/5. (*Id.*) Knee flexion and extension were both 4+/5. (*Id.*) Dorsiflexion and plantar flexion were 5/5. (*Id.*) Deep tendon reflexes were symmetrically present for bilateral patella tendons. (*Id.*) Ankle jerks could not be elicited. (*Id.*) Plaintiff's sensation was intact. (*Id.*) Straight-leg raising was negative. (*Id.*) Plaintiff was able to transfer from supine to sitting position and stand independently with minimal difficulty. (*Id.*) His gait was antalgic on the left. (*Id.*) Dr. Stein's impressions of plaintiff were open reduction internal fixation of the left hip fracture, and possible traumatic

arthritis of the left hip. (*Id.*) Dr. Stein stated that, at that time, plaintiff should not engage in lifting, bending, pushing, pulling, crawling, climbing, or activities that require prolonged standing. (*Id.*)

On February 27, 1998, Dr. Stein reported that x-rays of plaintiff's pelvis, including his hips, revealed degenerative changes to both acetabulum and that the left hip was well aligned. (Tr. 246.) Moreover, the x-rays revealed that hardware was in place in the left femur, which was well aligned. (*Id.*) X-rays of plaintiff's left knee showed blurring of the proximal tibia with loss of clear delineation of the cortex. (*Id.*) X-rays of plaintiff's left ankle showed reactive changes involving the dome of the talus. (*Id.*)

b. Dr. C. Montorfano

On March 25, 1998, Dr. C. Montorfano opined that plaintiff's hip condition did not meet the Listing of Impairments. (Tr. 255.) Dr. Montorfano found that plaintiff could lift and carry twenty pounds. (*Id.*) However, he stated that plaintiff should avoid prolonged walking, frequent operation of controls with the left leg, climbing ladders or scaffolds, balancing, frequent climbing of stairs, kneeling, crouching and crawling. (*Id.*) Dr. Montorfano also found that there was no gross limitation of stooping. (*Id.*)

On March 27, 1998, Dr. Montorfano completed a physical residual functional capacity assessment and made the following findings: Plaintiff could lift and carry twenty pounds occasionally and ten pounds frequently, sit for six hours, and stand and/or walk for two hours in an eight-hour day. (Tr. 257.) Plaintiff had limited ability to use his left leg to operate foot controls. (*Id.*) Plaintiff could stoop frequently, but needed to avoid balancing and climbing ladders, ropes and

scaffolds. (Tr. 258.) He could occasionally kneel, crouch, crawl and climb ramps and stairs. (*Id.*) Dr. Montorfano found that plaintiff could perform light work with the aforementioned postural limitations. (Tr. 261.)

c. Dr. Yuriy Kheyfits

On September 28, 1998, Dr. Yuriy Kheyfits completed a psychiatric medical report regarding plaintiff and stated the following: Following plaintiff's hospitalization in February 1998, plaintiff was treated weekly from March 9, 1998 to September 28, 1998. (Tr. 283.) On September 28, 1998, a mental status examination of plaintiff revealed that he was disheveled and unkempt. (*Id.*) However, he was cooperative and friendly, there were no behavioral or motor abnormalities, his speech was well articulated, and his thoughts were coherent and goal-oriented. (*Id.*) Moreover, his mood was euthymic. (*Id.*) His affect was appropriate and full range. (*Id.*) His attention, concentration and memory were intact. (Tr. 284.) Plaintiff was oriented in three spheres. (*Id.*) His information was average. (*Id.*) His ability to perform calculations was not impaired. (*Id.*) Plaintiff stated that he maintained his personal hygiene, went shopping, went to synagogue and visited relatives. (*Id.*) He stated that he had good relationships with family members. (*Id.*) Plaintiff denied suicidal ideations. (Tr. 285.)

Dr. Kheyfits opined that plaintiff had fair ability to relate to co-workers, deal with the public, use judgment, deal with work stresses, function independently, complete job instructions, behave in an emotionally stable manner, relate predictably in social situations and demonstrate reliability. (Tr. 287-88.) He had good ability to maintain attention and concentration. (Tr. 287.) His ability to follow

simple job instructions was fair to good. (*Id.*) He had some mood instability. (Tr. 288.) He had poor ability to maintain personal appearance. (*Id.*)

## 5. Examinations at the Maimonides Medical Center

On November 9, 1998, x-rays of plaintiff's pelvis and left hip were completed at the Maimonides Medical Center and, according to Dr. Steven Shankman, revealed that the joint space was fairly well maintained, and no osteonecrosis was seen. (Tr. 519.)

Clinic notes from Maimonides Medical Center indicate that plaintiff was evaluated for complaints of hematuria. (Tr. 526.) On October 29, 1998, Dr. Betty Triantafllou reviewed and interpreted images from a renal and pelvic ultrasound of plaintiff and opined that there was no evidence of postvoid residual urine. (Tr. 527.) Plaintiff again visited the clinic at Maimonides Medical Center on January 20, 1999. (Tr. 518.) At that time, an IVU with nephrotomography revealed a dromedary kidney on the left side and possible gallstones. (*Id.*)

## 6. The Neuropsychological Evaluation of Plaintiff

On December 23, 2004, at the request of plaintiff's counsel, Dr. Paul Berger-Gross performed a neuropsychological evaluation of plaintiff. Dr. Berger-Gross conducted intelligence testing of plaintiff using the WAIS-III criteria, which revealed that plaintiff had a full scale IQ of 74, a verbal IQ of 83, and a performance IQ of 68. (Tr. 555.) Dr. Berger-Gross found that plaintiff's intellectual functioning was in the low normal range. (*Id.*) Plaintiff's verbal skills, which included normal reading and writing skills, were significantly better than his ability to work with visually presented materials. (Tr. 555-56.) His language skills were in the low-average to low-normal range. (*Id.*) Dr. Berger-Gross found that, with repetition, plaintiff could recall both verbal and visual material. (Tr. 556-57.) Plaintiff had conflicts regarding his need for achievement and feelings of inadequacy. (Tr. 558.) Dr. Berger-Gross diagnosed plaintiff with dysthymic disorder on Axis I, borderline intellectual functioning on Axis II, and a GAF of 60 on Axis V. (Tr. 559.) Dr. Berger-Gross recommended plaintiff undergo evaluation by a vocational or rehabilitation counselor to determine his aptitude for future employment. (*Id.*)

## E. The Present Action

Plaintiff filed the present action on September 23, 2005 challenging the Commissioner's decision.[3] On February 8, 2006, this case was re-assigned to the undersigned. Defendant filed its fully submitted motion for judgment on the pleadings on March 2, 2007.

## II. DISCUSSION

## A. Applicable Law

### 1. Standard of Review

A district court may only set aside a determination by an ALJ that is based upon legal error or not supported by substantial evidence. *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998) (citing *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982)). The Supreme

---

[3] Pursuant to 20 C.F.R. § 404.981, the decision of the Appeals Council dated April 20, 2005 is the final decision of the Commissioner, and, thus, plaintiff's appeal is construed as challenging that decision.

Court has defined "substantial evidence" in Social Security cases as "more than a mere scintilla" and that which "a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Quiones v. Chater*, 117 F.3d 29, 33 (2d Cir. 1997) (defining substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion") (internal quotations and citations omitted). Furthermore, "it is up to the agency, not th[e] court, to weigh the conflicting evidence in the record." *Clark v. Comm'r of Social Sec.*, 143 F.3d 115, 118 (2d Cir. 1998). If the court finds that there is substantial evidence to support the Commissioner's determination, the decision must be upheld, even if there is substantial evidence for the plaintiff's position. *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998); *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991). "Where an administrative decision rests on adequate findings sustained by evidence having rational probative force, the court should not substitute its judgment for that of the Commissioner." *Yancey*, 145 F.3d at 111; *see also Jones*, 949 F.2d at 59 (quoting *Valente v. Sec'y of Health and Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984)).

### 2. The Benefits Determination

A claimant is entitled to disability benefits under Title II (regarding SDI benefits) or Title XVI (regarding SSI benefits) of the Act if the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). An individual's physical or mental impairment is not disabling under the Act unless it is "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

The Commissioner has promulgated regulations establishing a five-step procedure for evaluating disability claims. *See* 20 C.F.R §§ 404.1520, 416.920. The Second Circuit has summarized this procedure as follows:

> The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed. If the claimant is not employed, the [Commissioner] then determines whether the claimant has a "severe impairment" that limits her capacity to work. If the claimant has such an impairment, the [Commissioner] next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations. When the claimant has such an impairment, the [Commissioner] will find the claimant disabled. However, if the claimant does not have a listed impairment, the [Commissioner] must determine, under the fourth step, whether the claimant possesses the residual functional capacity to perform her past relevant work. Finally, if the claimant is unable to perform her past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work.

*Brown*, 174 F.3d at 62 (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)). The claimant bears the burden of proof with regard to the first four steps; the Commissioner bears the burden of proving the last step. *Brown*, 174 F.3d at 62.

The Commissioner "must consider" the following in determining a claimant's entitlement to benefits: "(1) objective medical facts and clinical findings; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability; and (4) claimant's educational background, age, and work experience." *Id.* (citing *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983)).

## B. Application

Plaintiff argues that the Commissioner's motion should not be granted. (Pl.'s Mem., at 2.) For the reasons that follow, this Court concludes that the Commissioner's decision was supported by substantial evidence.

In considering plaintiff's application for benefits, the Commissioner applied the five-step procedure for evaluating disability claims. At step one, the Commissioner found that plaintiff had not engaged in substantial gainful activity since January 1, 1993. (Tr. 16.) At step two, the Commissioner found that plaintiff had the following severe impairments: a history of left hip fracture requiring open reduction and internal fixation, a history of seizure disorder, and an adjustment disorder. (*Id.*) At step three, the Commissioner found that plaintiff's impairments did not meet the criteria set forth in the Listing of Impairments in 20 C.F.R. Para. 404, Subpart P, Appendix 1. (*Id.*) Accordingly, the Commissioner proceeded to step four, and found that plaintiff is unable to perform his past relevant work as a warehouse worker "because it required medium exertion." (Tr. 17.)

Next, the Commissioner determined that plaintiff was capable of performing other work. (*Id.*) Specifically, the Commissioner found that, although plaintiff was unable to perform the *full* range of work "at the light

exertional level,"[4] there were "a significant number of jobs [at the light exertional level] in the national economy which he could perform" (*Id.*) Accordingly, the Commissioner found that plaintiff was not disabled, as defined in the Act, prior to March 28, 2002. (*Id.*)

The Commissioner further found that, pursuant to 20 C.F.R. § 416.920(g), plaintiff was considered "an individual of advanced age" as of March 28, 2002, when plaintiff reached the age of 55. (*Id.*) Therefore, because a more expansive definition of "disabled" applies to individuals in that age category, the Commissioner found that plaintiff was disabled, and thus entitled to benefits, as of March 28, 2002.[5] (*Id.*)

Plaintiff does not argue that the Commissioner failed to consider any evidence or made any legal error. Nor does plaintiff specifically point to any finding by the Commissioner that was allegedly not supported by substantial evidence. Instead, plaintiff merely expresses displeasure with the Commissioner's "interpretation" of the evidence. (Pl.'s Mem. at 2.)

---

[4] Pursuant to 20 C.F.R. § 416.967(b),

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.

[5] The finding that plaintiff was disabled as of March 28, 2002 is the only point of distinction between the ALJ's ruling and the decision of the Appeals Council (which constitutes the final decision of the Commissioner).

Specifically, plaintiff argues that the Commissioner, in making the disability determination, failed to properly consider plaintiff's "severe pain, inability to stand or sit for extended periods, depression, or his low intelligence as these factors would affect his employability or job performance." (*Id.*) The Court rejects plaintiff's argument and finds that the Commissioner fully considered plaintiff's claims.

At the ALJ hearing on January 13, 2004, the ALJ, after considering (1) the objective medical facts and clinical findings in the record; (2) the diagnoses or medical opinions based on such facts; (3) the subjective evidence of pain or disability, derived from plaintiff's testimony; and (4) plaintiff's educational background, age, and work experience, concluded that plaintiff "retains . . . the exertional functional capacity to perform light work-related duties," and that "the record . . . is devoid of consistent diagnostic evidence in support of the [plaintiff's] allegation of inability to engage in any work activity." (Tr. 25.) As to plaintiff's allegations that certain physical conditions, including "severe pain" and the "inabiilty to stand or sit for extended periods" (Pl.'s Mem., at 2), prevent him from working, the ALJ considered "all symptoms [experienced by plaintiff], including pain" in reaching her decision as well as plaintiff's "testimony concerning his symptoms and limitations." (Tr. 25) As to plaintiff's allegations that his mental state and his "low intelligence" (Pl.'s Mem., at 2) also rendered him unable to work, the ALJ considered evidence and testimony regarding plaintiff's "psychiatric ailment/treatment" as well as his "intellectual functioning."[6] (Tr. 25-26.)

Subsequently, the ALJ found that plaintiff's allegation that he was unable to engage in any work activity was not supported by any medical evidence and, thus, declined to credit plaintiff's testimony regarding his alleged inability to work. (Tr. 27.) Specifically, the ALJ noted that "a review of the entire record indicated that no treating or examining physician issued a valid medically supported opinion that the claimant was totally disabled from work," and, as such, that "other than [plaintiff's own] testimony, the [plaintiff] offered no medical evidence to support 'disability.'" (Tr. 26-27.) The Appeals Council adopted the ALJ's findings, so far as they related to plaintiff's inability to work prior to March 28, 2002. (Tr. 16.) Significantly, in the instant action, plaintiff does not dispute the Commissioner's finding that plaintiff's allegation of disability is unsupported by any evidence other than his own testimony.

The Court finds that there is substantial evidence to support the Commissioner's decision that plaintiff was not disabled prior to March 28, 2002. First, objectively verifiable medical evidence indicates that plaintiff's hip condition did not prevent him from engaging in work activity at the light exertional level prior to March 28, 2002. Medical records indicate that plaintiff's fracture had healed fully by October 1995. (Tr. 199.) Moreover, in November 1995, Dr. Banerjee found that plaintiff had a stable gait, did not need a cane to walk, and had no difficulty getting onto the examining table and lying down. (Tr. 182.) In addition, in November 1996, Dr. Feliccia found that plaintiff was able to stand erect, had a mild antalgic gait, and had good muscle mass. (Tr. 185.) Examinations by Dr. Mancheno in September 1997 and Dr. Stein in February 1998 yielded similar diagnoses as to plaintiff's physical condition. (Tr. 214, 247.)

---

[6] The ALJ also specifically considered the results of the neuropsychological evaluation of plaintiff conducted by plaintiff's own expert, Dr. Burger-Gross. (Tr. 25-26.)

Second, the Court finds that there is substantial objectively verifiable evidence to support the Commissioner's finding that neither plaintiff's seizure disorder nor his mental condition prevented him from engaging in light work activity prior to March 28, 2002. As to the seizure disorder, although plaintiff testified that he had a history of seizures, there is no diagnostic evidence in the record demonstrating that such a disorder prevented him from working. The sole record evidence of plaintiff's treatment for a seizure disorder is provided by records from Maimonides Medical Center, indicating that, following treatment at the Center in 1998 for depression, plaintiff received a two-week supply of Dilantin to treat his seizures. (Tr. 244.) As to plaintiff's mental condition, although plaintiff was treated for depression in 1998, the diagnostic medical records indicate that plaintiff's mental condition improved significantly with therapy at that time. (Tr. 267, 479.) Moreover, following his release from the Center in 1998, plaintiff received outpatient therapy, concluding in September 1998. (Tr. 283-88.) At the conclusion of outpatient therapy, plaintiff's treating physician, Dr. Kheyfits, found that plaintiff had fair to good abilities to perform work-related mental activities. (*Id.*)

Third, the Court finds that there is substantial objectively verifiable evidence to support the Commissioner's finding that, although plaintiff could no longer perform his past relevant work, he could perform other work. (*See* Tr. 17.) Substantial evidence in the record indicates that plaintiff had the ability to perform a significant range of light work pursuant to medical-vocational Rules 202.10 and 202.17, 20 C.F.R. Part 404, Subpart P, App. 2. As discussed *supra*, there is substantial medical evidence indicating that plaintiff had the physical, or "exertional," capabilities to perform certain kinds of light work. (*See* Tr. 17.) Moreover, the testimony of Ramnauth, the vocational expert, at the

ALJ hearing provided substantial evidence to conclude that a person of plaintiff's specific work restrictions is "capable of making a vocational adjustment to other work." (Tr. 17, 28.) Specifically, based upon the medical evidence in the record detailing plaintiff's physical capabilities, Ramnauth testified that an individual with plaintiff's specific limitations was able to perform work as an assembler, assembler at the light exertional level, a document preparer or as a ticket taker. (Tr. 17, 27.) Thus, the Court finds that the Commissioner has met his burden to provide substantial evidence demonstrating that, although plaintiff could no longer perform his past relevant work, plaintiff is capable of performing other work.

Finally, the Court finds that there is substantial evidence to support the Commissioner's finding that plaintiff's subjective accounts of pain were not credible and that plaintiff's pain did not sufficiently restrict his functional capabilities so as to render him disabled, as defined in the Act, prior to March 28, 2002. As the Second Circuit has observed:

> The ALJ has discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant.

*Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979). However, when the claimant alleges pain that exceeds the objectively verifiable evidence, the Commissioner must consider several evaluative factors, including daily activities, medication, and causes of the pain, in order to determine the extent to which the pain affects the claimant's functional capabilities. *See* 20 C.F.R. § 404.1529(c)(3)(i)-(iv).

In this case, the Commissioner noted, based on plaintiff's testimony, that plaintiff's daily activities included cooking, cleaning, shopping, driving, and using public transportation; that his hobbies included smoking his pipe, watching television, and visiting the library; that plaintiff was able to walk 2-3 blocks at a time, could climb stairs and stand or walk for about twenty minutes at a time, and was able to take care of his wife. (Tr. 16, 26-27.) Moreover, the Commissioner noted that plaintiff only took Tylenol for his hip and back pain, and that plaintiff had not sought psychiatric treatment for his mental condition since 1998. (Tr. 16, 26.) For these reasons, in conjunction with the voluminous objective medical evidence regarding plaintiff's ability to engage in light work, the Commissioner determined that, notwithstanding plaintiff's subjective evidence of pain, plaintiff "retain[ed] the residual functional capacity to perform light level work" prior to March 28, 2002. (Tr. 16, 26.) This Court finds that the above-cited evidence provides "substantial evidence" for the Commissioner's determination. *See, e.g., Aponte v. Sec'y of the Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir.1984) ("If the Secretary's findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints of pain.") (internal citations omitted); *Carrington v. Barnhart*, No. 04 Civ. 5187 (JGK), 2005 U.S. Dist. LEXIS 24637, at *31-*33 (S.D.N.Y. Oct. 19, 2005) ("Furthermore, it is the function of the [Commissioner], not [the courts], to resolve evidentiary conflicts and to appraise the credibility of the witnesses, including the claimant.") (internal quotations and citations omitted); *Perez v. Barnhart*, 234 F. Supp. 2d 336, 341 (S.D.N.Y. 2002) (finding that "the ALJ's decision to discount Plaintiff's subjective complaints of pain is supported by substantial evidence").

III. CONCLUSION

For the foregoing reasons, respondent's motion for judgment on the pleadings is GRANTED. The Clerk of the Court shall enter judgment accordingly and close this case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: March 27, 2007
Central Islip, NY

* * *

The representative for plaintiff is Yaakov Kanovsky, 1138 52nd Street, Brooklyn, New York 11219. The attorney for defendant is Roslynn R. Mauskopf, United States Attorney, by Edward K. Newman, Esq., Assistant United States Attorney, One Pierrepont Plaza, Brooklyn, New York 11201.